UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAXLORIE ALPHONSE,

*Plaintiff*,

-v.-

BERLIN ROSEN, LLC (DBA Orchestra)
(Including all DBAs and Affiliates)

*Defendant*.

---

**COMPLAINT**

Case No. _____

Jury Trial Demanded

---

Plaintiff Maxlorie Alphonse, by and through counsel, as and for her Complaint against Defendant Berlin Rosen, LLC alleges as follows, on personal knowledge as to her own acts and observations and on information and belief as to all other matters.

**INTRODUCTION**

1.      Berlin Rosen, LLC ("BerlinRosen") tells the world it is "at the nexus of racial and economic justice, human rights, and civic participation," boasting that it helps clients "elevate marginalized voices and advance equity." But BerlinRosen did not extend that same commitment to its own Black employees. It ran a two-tiered system internally, and used it against Maxlorie Alphonse, a Black woman, during her time at the firm.

2.      When Ms. Alphonse pitched an idea, her supervisor called it irrelevant. Days later, that same supervisor approved the identical idea from a non-Black colleague. When Ms. Alphonse thrived anyway, earning praise from every account manager she worked under, BerlinRosen invented a performance problem out of thin air and slashed her time to respond to it.

1

3.     When Ms. Alphonse reported discrimination and unfair treatment to Human Resources and BerlinRosen's Chief Culture Officer, laying out the evidence in writing, the firm investigated nothing and did nothing. It fired her three days later.

4.     Ms. Alphonse's experience was not an isolated incident, but part of a larger, continuing pattern at BerlinRosen of pushing out Black employees. Ms. Alphonse stands up for her rights and the rights of Black employees at BerlinRosen who have experienced this same pattern of discriminatory treatment.

5.     This case is brought to remedy violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law.

## PARTIES

6.     Ms. Alphonse is a resident of New York and currently resides in Brooklyn, New York.

7.     BerlinRosen is a leading national public relations and strategic communications firm with its principal place of business located in New York City. It is incorporated under the laws of New York, and it is a citizen of New York.

## JURISDICTION AND VENUE

8.     This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1331. This action raises claims under federal civil rights statutes, and the city and state law claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution. *See* 28 U.S.C. § 1367.

9.     This Court has personal jurisdiction over the Defendant as the acts and events giving rise to this case occurred in New York, New York.

10.    Venue is proper in the Southern District of New York as the acts and events giving rise to this case occurred in the Southern District of New York.

## ADMINISTRATIVE PREREQUISITES

11.    Ms. Alphonse filed a Charge with the Equal Employment Opportunity Commission ("EEOC") on April 1, 2025.

12.    On April 30, 2026, the EEOC administratively discharged Ms. Alphonse's charge and issued her a Notice of Right to Sue.

13.    Ms. Alphonse files this action within 90 days of the EEOC's issuance of the Notice of Right to Sue.

## STATEMENT OF FACTS

### I.    Ms. Alphonse's Background

14.    BerlinRosen hired Ms. Alphonse in September 2022 as a social media intern in its luxury real estate marketing team, internally known as Maiden & John, following her graduation from the University of Hartford with a degree in Music Management and Marketing.

15.    As an intern, Ms. Alphonse reported to Account Supervisor Annie Mak. Ms. Mak and other managers gave Ms. Alphonse positive feedback and extended her internship through May 2023.

16.    At the time, BerlinRosen did not have a dedicated social media coordinator, so Ms. Alphonse pitched herself for that permanent position. Ms. Alphonse also applied for other open roles at BerlinRosen, including an account coordinator role on BerlinRosen's Lifecycle team.

17.    Account Director, now Vice President, Marissa Paiano interviewed Ms. Alphonse for the account coordinator role.

18.    Although Ms. Mak recommended Ms. Alphonse for the position, Ms. Paiano told Ms. Alphonse that ultimately BerlinRosen had selected another candidate with "more PR experience."

19.    That candidate was a recent college graduate with *less* PR experience than Ms. Alphonse. She was also a White woman.

20.    While interning at BerlinRosen, Ms. Alphonse went back to school earning her Master's in Business Administration from Pace University in 2024.

21.    She then applied for an account coordinator role on BerlinRosen's Impact team.

22.    Even with glowing references—from Ms. Mak and BerlinRosen Vice President Timothy Chun—Ms. Mak told Ms. Alphonse that she and Talent Associate Courtney Diggs had to fight for her hire. Ms. Mak said she did not understand BerlinRosen's resistance, given her proven track record as an intern.

23.    The position Ms. Alphonse applied for reported to Vice President Michelle Moreh (a White woman). Ms. Moreh insisted on meeting with Ms. Mak to learn more about Ms. Alphonse before agreeing to hire her—a step Ms. Mak said was not standard practice.

24.    Ms. Mak confirmed that she'd never had to fight this hard to get a White candidate hired.

25.    On October 25, 2024, after multiple rounds of interviews, skills assessments, and reference checks, BerlinRosen finally hired her as an Account Coordinator.

## II.    BerlinRosen Holds Ms. Alphonse to a Double Standard

26.    On November 11, 2024, Ms. Alphonse began as an account coordinator at BerlinRosen under Ms. Moreh.

4

27.    At the start of Ms. Alphonse's employment, Ms. Moreh laid out the plan: 30-, 60-, and 90-day check-ins over the course of a 90-day probationary period, plus weekly Friday check-ins. Those weekly meetings covered how she was settling in and various housekeeping items.

28.    Ms. Moreh never once critiqued Ms. Alphonse's job performance or offered any negative feedback during them.

29.    Ms. Alphonse took pride in the accounts she managed—accounts that aligned with her identity and her values: SisterSong and In Our Own Voice, which amplify Black women's voices in reproductive justice; the Kellogg Foundation's Expanding Equity program; and Columbia School of Social Work's project with Dr. Riana Anderson on Black mental health.

30.    Ms. Moreh personally managed the account with the Columbia School of Social Work ("Columbia Project"). Out of five employees on it, Ms. Alphonse was the only Black one. Out of five professors on BerlinRosen's Columbia roster, Dr. Anderson was the only Black one.

31.    Ms. Moreh told Ms. Alphonse to "learn [Dr. Anderson's] voice," which included understanding Dr. Anderson's work, the mission behind it, and its importance in connection with contemporary events.

32.    Ms. Moreh explained that this was necessary because Ms. Moreh was tasked with finding topics and stories that Dr. Anderson could comment on in news outlets, and Ms. Alphonse's role was to identify pitches that would serve that purpose.

33.    Ms. Alphonse studied Dr. Anderson's work on Black mental health in order to propose topics and stories that Dr. Anderson could comment on that would advance Dr. Anderson's mission and PR objectives.

34.    For example, Ms. Alphonse identified a media trend on women's mental health in hip-hop, and proposed that Dr. Anderson speak on rapper Doechii's battle with anxiety in Doechii's recent project, "Alligator Bites Never Heal." Many of the pitches that the Columbia Project pursued originated from Ms. Alphonse's individually proposed ideas.

35.    Yet on more than one occasion, Ms. Moreh rejected an idea from Ms. Alphonse—only to ultimately approve the same idea when it came from someone else.

36.    For instance, during the January 2025 California Wildfires, Ms. Alphonse pitched an idea where Dr. Anderson could comment on how the fires had burned through Allensworth, California, which was the first neighborhood in California to allow Black people to own homes. Ms. Alphonse explained that the devastation in Allensworth had erased important lineages for the Black community, which tied to Black people's sense of belonging and mental health.

37.    Ms. Moreh shut down Ms. Alphonse's idea and said that it didn't connect to mental health or Dr. Anderson's work. Days later, Dr. Anderson's point of contact pitched Ms. Moreh the identical idea. This time, Ms. Moreh approved it.

38.    In other instances, Ms. Moreh gave ownership of Ms. Alphonse's pitches and projects to Claire Connelly, a non-Black Account Executive who had previously worked at BerlinRosen, left, and returned in January 2025 to join the Columbia Project team.

39.    Ms. Moreh required Ms. Alphonse to submit a written summary or memo of her pitch ideas before she was permitted to act on them, but Ms. Moreh did not impose this requirement on Ms. Connelly. Ms. Moreh gave Ms. Connelly the green light to act on whatever pitches she wanted without any such preapproval.

40.     For example, Ms. Alphonse pitched an idea, created the supporting materials for it, and the idea was approved. However, Ms. Moreh then assigned Ms. Connelly to lead the resulting project instead of Ms. Alphonse.

41.     Ms. Alphonse was the only Black employee assigned to the Climate Power and Kellogg Expanding Equity accounts, each of which had six to eight BerlinRosen employees.

42.     The Kellogg account was floundering when Ms. Alphonse joined BerlinRosen; it could not get its DEI messaging right, and BerlinRosen struggled to understand the client's goals for its public relations messaging. The Vice Presidents assigned to the account—Laurel Schwartz and Samantha Lasky (both White)—did not have a solid understanding of DEI, its historical importance, or its relevance to contemporary politics. Ms. Schwartz and Ms. Lasky would often pitch ideas to the client, who repeatedly rejected their proposals.

43.     Ms. Alphonse wanted to contribute to that messaging effort, but her BerlinRosen colleagues never included her in substantive or strategic discussions, relegating her instead to proofreading messaging drafts and pulling clips on DEI-related news. This was less substantive than what she should have been responsible for as an Account Coordinator, including, but not limited to, media outreach, developing media relationship strategies to secure earned media coverage, researching industry trends, participating in client meetings, drafting press releases.

44.     Ms. Schwartz and Ms. Lasky ignored Ms. Alphonse's multiple requests to include her on the account's Slack channel, the method the team uses for collaborating. It took several weeks for someone on the team to finally add her.

45.     While Ms. Alphonse loved the work on her accounts, she felt that BerlinRosen had assigned her accounts for race-based optics. BerlinRosen tokenized Ms. Alphonse.

46.     Despite BerlinRosen's diverse accounts with different purposes and meanings, all of Ms. Alphonse's accounts were related in some way to the Black identity—Dr. Anderson was a Black professor who studied Black mental health, The Kellogg Foundation's Expanding Equity program was working to expand opportunities in the private sector for Black and other marginalized communities, and SisterSong and In Our Own Voice amplified Black women's voices in reproductive justice.

47.     BerlinRosen expected Ms. Alphonse to be visible at all client-facing meetings, but it rarely allowed Ms. Alphonse to contribute beyond surface-level tasks. She had lived experiences and knowledge that would have made her a valuable asset to these teams. BerlinRosen never gave her the chance to use them.

48.     And it came at a cost: because BerlinRosen boxed Ms. Alphonse into accounts tied to Black identity, she never had the opportunity to work in the firm's most profitable sectors, such as real estate.

49.     BerlinRosen originally told Ms. Alphonse her hours would be 9:00 A.M. to 5:00 P.M. In reality, she had to start working as early as 5:00 A.M. to meet the 8:15 A.M. daily "clips" deadline for the Climate Power account—and she met that deadline every day.

50.     Ms. Moreh insisted the clips should take no more than an hour each morning, yet quietly adjusted Ms. Alphonse's "official" hours to 7:00 A.M.–4:00 P.M., even though in reality Ms. Alphonse was working from 5:00 A.M.–6:00 P.M. Meanwhile, the Climate Power account managers told her to "get started" on morning clips "the night before," making clear that one hour was never really enough.

51.     On top of that, BerlinRosen regularly required her to work until 6:00 or 7:00 P.M. — 12- or 13-hour days. When she raised this with SisterSong Account Manager Bri Sislo, Ms. Sislo was sympathetic, but told her plainly that BerlinRosen didn't "do overtime anymore."

**III.     Ms. Alphonse Exceeds Expectations And Receives Glowing Feedback**

52.     Ms. Moreh cancelled Ms. Alphonse's November 11 "30-day check-in" without any reason. On January 10, 2025, Ms. Moreh finally met with Ms. Alphonse and gave her feedback on her work (61 days into her employment).

53.     During this meeting, Ms. Moreh said she appreciated Ms. Alphonse's work and acknowledged that Ms. Alphonse had a lot on her plate. When Ms. Alphonse updated her on various accounts, Ms. Moreh expressed approval. When Ms. Alphonse mentioned resources she'd put together on her own initiative, Ms. Moreh repeatedly called it "great" and "awesome" and asked her to share the documents with the rest of the team. The meeting was overwhelmingly positive and there was no indication whatsoever that Ms. Alphonse's job was in jeopardy.

54.     Given her long hours and early start, Ms. Alphonse asked Ms. Moreh if she could work remotely three days per week instead of two.

55.     Ms. Moreh consulted Executive Vice President Margaret Delaney, then reported back that Ms. Delaney had said she could not work remotely because "it's policy" for employees to be in the office three days a week.

56.     This contradicted BerlinRosen's actual written policy, which required only two days in office per week.

- Effective September 5, 2023, all employees who live within a commuting distance of 90 minutes or less from one of our office locations are considered hybrid employees.
  - VP-level staff and above must report to that office location a minimum of 3 days per week.
  - All other hybrid employees must report to that office location a minimum of 2 days per week.

57.    Meanwhile, another Account Coordinator, Carina Pacheco, a White woman hired the same day as Ms. Alphonse, who also reported to Ms. Moreh, worked from home 3+ days per week at will and without limitation, often announcing it casually to the team Slack channel.

58.    Ms. Alphonse continued to work in the office three days per week per Ms. Moreh's instruction.

59.    One week later during a January 17, 2025 meeting with Climate Power account managers Adriana Guzman and Michelle Weinfurt, they both said they appreciated Ms. Alphonse's work on the account and gave her uniformly positive feedback on her work. Ms. Weinfurt specifically said the client had been "super pleased" with her work on the clips each morning, "singing our praises" about how helpful they'd been, and emphasized more than once that her hard work had not gone unnoticed.

60.    On January 24, 2025, Ms. Alphonse met with Ms. Sislo regarding the SisterSong account. Ms. Sislo said Ms. Alphonse had done a good job of learning the client's voice and editing a video script (drafted by someone else) to match the client's tone and messaging.

**IV.    Despite Uniformly Positive Feedback, BerlinRosen Reverses Course And Sets Ms. Alphonse Up For Termination**

61.    On January 28, 2025, Ms. Moreh met with Ms. Alphonse for her "60-day" (even though she had already met with Ms. Alphonse 60 days into her employment).

62.    Ms. Moreh unexpectedly issued Ms. Alphonse a "90-Day Probationationary Period Memo of Concern."

10

63.     For the first time, Ms. Moreh told Ms. Alphonse that she was not meeting expectations and said Ms. Alphonse could be fired at any moment.

64.     Ms. Alphonse was shocked, as prior to this point, during all their weekly check-ins and their delayed "30-day" check-in, Ms. Moreh had not indicated that Ms. Alphonse was not meeting expectations. To the contrary, Ms. Alphonse's account managers had all given Ms. Alphonse positive feedback up until this moment.

65.     The content of the Memo did not align with reality. It claimed that Ms. Alphonse had failed to pitch ideas and implement feedback about learning the client's voice for the SisterSong account, but Ms. Alphonse had pitched a number of successful ideas on this account. Just days earlier, SisterSong account manager Bri Sislo had thanked Ms. Alphonse for learning the client's voice so well.

66.     The Memo claimed Ms. Alphonse needed to be more proactive, but Ms. Alphonse was proactive, and her account managers had already praised her for her proactivity more than once.

67.     It also claimed Ms. Alphonse had repeatedly failed to implement feedback about how to find the best Climate Power clips and properly categorize them, which was false.

68.     The only legitimate criticism Ms. Moreh could muster—regarding the Columbia account, which she herself managed—concerned a single misspelled name on an internal document and one forgotten press-list addition, even though Ms. Moreh had already praised Ms. Alphonse's Columbia work multiple times.

69.     The Memo claimed that Ms. Alphonse's account managers had already counseled her on all of these issues many times before, which was also false.

11

70.    The 17-day delay in her 60-day check-in significantly shortened her timeline to course-correct, leaving her with only five business days to cure problems that, by her own managers' account, didn't exist. Had the check-in occurred on time, she would have had triple the time to incorporate feedback and protect her job. In what little time remained, Ms. Alphonse sprang into action.

71.    Ms. Alphonse relayed all of these concerns to Ms. Moreh and told her that she believed the Memo was unfair.

72.    Ms. Moreh responded by agreeing to speak with the Account Managers and confirm that the Memo was correct. Ms. Alphonse never received any confirmation as to whether Ms. Moreh followed through on her promise.

73.    Immediately after this meeting, Ms. Moreh scheduled a "wellness" day for Friday, January 31, even though Ms. Alphonse and Ms. Moreh routinely had 1:1 meetings scheduled on Friday, thereby making it impossible for Ms. Alphonse to get feedback from her manager in the short window before her probation ended.

74.    Ms. Alphonse asked for a follow-up meeting for January 28, which Ms. Moreh initially agreed to. However, once Ms. Alphonse told Ms. Moreh she wanted her union steward[1] to attend the meeting as well, Ms. Moreh cancelled.

75.    On January 29, 2025, Ms. Alphonse met with account managers Bri Sislo and Kindeya Chiaro regarding the Memo. Both seemed surprised by it and said they had consistently given Ms. Moreh positive feedback about her performance.

76.    Ms. Sislo said her work was good and that she appreciated how proactive she was—she had also just told Ms. Moreh as much recently.

---

[1] Ms. Alphonse included a union stewart in the meeting because her union representative advised her that if Ms. Alphonse was able to maintain her employment through February 7, she would be entitled to attorney representation from the union.

77.     Ms. Chiaro called it "shitty" that BerlinRosen hadn't given Ms. Alphonse the Memo in a timely manner, leaving her without enough time to show improvement, and said the Memo contradicted her own experience working with Ms. Alphonse.

78.     Ms. Sislo said she wanted to help Ms. Alphonse use the small amount of time left in her probation to prove herself to Ms. Moreh.

79.     Both said they were "100%" behind her and suggested she solicit feedback directly from the Climate Power and Kellogg account managers without mentioning the Memo.

80.     On January 30, 2025, Ms. Alphonse met with account managers Adriana Guzman and Michelle Weinfurt regarding the Climate Power account.

81.     Ms. Alphonse asked Ms. Guzman and Ms. Weinfurt if there had been any issues with her categorization of clips.

82.     In response, Ms. Guzman and Ms. Weinfurt said they could only think of one instance where Ms. Alphonse had categorized a clip in a manner that differed from their preference, but they clarified that categorizations can be very subjective. They said that the way Ms. Alphonse had categorized this clip was "not necessarily wrong." They also said that in any event, this wasn't an issue because "moving one article takes seconds."

83.     Ms. Guzman said there was room for improvement in finding the best clips, and specifically thanked Ms. Alphonse for implementing feedback and expressed appreciation for her progress.

84.     That same day, Ms. Alphonse met with Kellogg managers Angie Ngo and Laurel Schwartz.

85. Without mentioning the Memo, she asked for guidance. Ms. Schwartz said she'd noticed a positive shift in recent weeks and was eager to hear more of her ideas. Ms. Ngo said she appreciated her initiative and thoughtful contributions on internal calls.

86. On January 31, 2025, Ms. Moreh said she was willing to meet with Ms. Alphonse and her union steward.

87. Ms. Moreh was extremely cold and it seemed like she did not want to talk to Ms. Alphonse. She told Ms. Alphonse that she should "take the lead" and did nothing to offer Ms. Alphonse feedback or guidance.

88. When Ms. Alphonse raised the Memo, Ms. Moreh admitted that Ms. Alphonse's account managers had positive things to say about her contributions, but she warned Ms. Alphonse that, notwithstanding any progress or positive feedback, BerlinRosen could still fire her on or before February 7 (the end of her 90-day probationary period) if it decided she wasn't a good "fit."

89. That evening, Ms. Alphonse called Ms. Mak to discuss the Memo of Concern and asked for her guidance.

90. Ms. Mak said she was disappointed, but not surprised, to hear how BerlinRosen had treated Ms. Alphonse. Ms. Mak explained that BerlinRosen has a pattern of race discrimination and "this is what they do" to Black employees. She pointed to how leadership had disrespected former employee Mariamah Jolla, openly scrolling and typing on their phones during her presentations. "They don't do this to White employees," Ms. Mak said.

91. She mentioned Jean Joe, a Black employee who had left BerlinRosen due to race discrimination, and said she felt it was because of Ms. Alphonse's race that she'd had to go

14

above and beyond to vouch for her in the hiring process—she'd never had to advocate that persistently for a White employee.

92.     Ms. Mak predicted, with regret, that even if Ms. Alphonse passed her probation, her race would still hold her back from moving up the ranks at BerlinRosen.

93.     Ms. Mak's tone was one of sympathy for Ms. Alphonse, mixed with concern and disgust regarding BerlinRosen's treatment of Black employees.

94.     Ms. Alphonse's experience was part of a larger and continuing problem in which BerlinRosen has disproportionately terminated, passed over, and pushed out Black employees across multiple teams and levels of seniority—while relying on those same employees for racial optics on client-facing accounts, and denying them the professional development, mentorship, and advancement opportunities afforded to their White and non-Black colleagues.

95.     This pattern persists notwithstanding BerlinRosen's public branding as a self-proclaimed champion of racial justice, equity, and progressive values.

**V.     Ms. Alphonse Reports Discrimination, BerlinRosen Fires Her**

96.     On February 3, 2025, Ms. Alphonse emailed Head of Human Resources Ursula Cassidy, copying her union reps.

97.     She explained the impact of the delayed 60-day check-in and last-minute Memo, and asked that her probationary period be extended commensurately to give her a fair opportunity to course-correct.

The delay in my check-in significantly shortened my timeline to course-correct, leaving me with only a **seven-day turnaround before facing potential termination**. Had this check-in been conducted on time, I would have had a clearer understanding of expectations and a fairer opportunity to improve.

The **timing of this delay, occurring so close to my probationary period, has caused significant emotional distress**. I want to understand how BerlinRosen ensures fairness in evaluations when procedural delays occur and whether there is an adjustment period given that feedback was not provided in a timely manner.

98.    She asked to discuss these concerns with Ms. Cassidy in person so they could work toward a resolution together, and sent a written rebuttal to the Memo—including a detailed timeline of her deliverables, email correspondence showing completed assignments and positive feedback, and records of her completed projects and proactive initiatives.

99.    That same day, she emailed Chief Culture Officer Thaly Germain, summarizing her situation and asking to have a discussion, and attached both the Memo and her rebuttal.

100.    On February 5, 2025, Ms. Cassidy finally replied thanking Ms. Alphonse for "taking the time to share [her] thoughts." She performed no investigation and took no remedial action. Ms. Alphonse wrote back, stating plainly that she had been subjected to "disparate treatment" and citing the State Human Rights Law.

> Dear Ursula,
>
> Thank you very much for acknowledging my last message. However, I would like to reiterate that the matters I raised are my direct experiences, not mere "thoughts," and therefore warrant a clear and substantive response from Human Resources. Given that HR is responsible for overseeing equitable procedures and ensuring adherence to company policy, I respectfully renew my request for a direct reply from HR rather than a response filtered solely through my manager.

> - **Relevant New York Employment Laws**
>   - While New York law generally permits at-will employment, employers are nevertheless expected to apply their internal rules consistently and avoid arbitrary or disparate treatment, as the New York State Human Rights Law and related civil employment regulations underscored.
>   - I would appreciate clarification on how these legal and procedural standards are being upheld in my situation, especially with regard to delayed reviews and the compressed timeline for improvement I have been given.

101.    Ms. Cassidy and BerlinRosen did not respond.

102.    That same day, Ms. Alphonse emailed Ms. Germain again to let her know she'd received no substantive response from HR, explaining that she felt "singled out" and "targeted as [a] Black woman."

> - **Feeling Targeted as a Black Woman**
>   - Given my identity as a Black woman in this workplace, the lack of clear, objective standards and the apparent willingness to terminate me at will is particularly troubling. It creates an unsettling dynamic where I cannot help but feel singled out rather than evaluated on the merits of my performance alone.

16

103. Again, there was no response.

104. The following morning, on February 6, 2025, Ms. Moreh texted Ms. Alphonse: "I have an update."

105. That afternoon, Ms. Moreh called Ms. Alphonse into a teleconference meeting with herself and Ms. Cassidy.

106. One day before Ms. Alphonse's probationary period was scheduled to end, BerlinRosen fired her.

107. Account Manager Angie Ngo texted Ms. Alphonse afterward and said that she had resigned from BerlinRosen in response to BerlinRosen firing Ms. Alphonse.

108. Ms. Ngo wrote: "What they did to you was truly the last straw."

109. A number of other current and former BerlinRosen employees reached out to Ms. Alphonse to express their support and solidarity. Many of them referred to BerlinRosen's pattern of race discrimination and retaliation and thanked Ms. Alphonse for having the courage to speak out.

## FIRST CAUSE OF ACTION
### Violation of 42 U.S.C. § 1981
### Discrimination

110. Ms. Alphonse incorporates each and every allegation of this Complaint as if fully set forth herein.

111. Ms. Alphonse is a Black woman.

112. BerlinRosen subjected Ms. Alphonse to differential terms and conditions of employment, harassed her, subjected her to a hostile environment, and terminated her.

113. BerlinRosen's adverse and/or differential treatment of Ms. Alphonse was motivated by her race and color, either in whole or in part.

17

114.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Alphonse has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

115.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Alphonse's rights, justifying punitive damages.

116.    Ms. Alphonse prays that the Court find BerlinRosen liable for discrimination in violation of 42 U.S.C. § 1981, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**SECOND CAUSE OF ACTION**
**Violation of 42 U.S.C. § 1981**
**Retaliation**

117.    Ms. Alphonse incorporates each and every allegation of this Complaint as if fully set forth herein.

118.    Ms. Alphonse engaged in activity protected by 42 U.S.C. § 1981, including but not necessarily limited to reporting race and color discrimination and retaliation to BerlinRosen leadership.

119.    BerlinRosen took adverse action against Ms. Alphonse, including, *inter alia*, terminating her employment following her protected complaints.

120.    BerlinRosen's adverse actions toward Ms. Alphonse were motivated by her protected activity, either in whole or in part.

121.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Alphonse has been damaged and continues to suffer damages, including but not limited to deprivation of

income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

122.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Alphonse's rights, justifying punitive damages.

123.    Ms. Alphonse prays that the Court find BerlinRosen liable for retaliation in violation of 42 U.S.C. § 1981, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**THIRD CAUSE OF ACTION**
**Violation of Title VII**
**42 U.S.C. § 2000e-2**
**Discrimination**

124.    Ms. Alphonse incorporates each and every allegation of this Complaint as if fully set forth herein.

125.    At all times relevant, Ms. Alphonse was an employee and BerlinRosen was an employer within the meaning of Title VII.

126.    BerlinRosen subjected Ms. Alphonse to differential terms and conditions of employment, harassed her, subjected her to a hostile environment, and terminated her.

127.    BerlinRosen's adverse and/or differential treatment of Ms. Alphonse was motivated by her race, color, and/or gender, either in whole or in part.

128.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Alphonse's rights, justifying punitive damages.

129.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Alphonse has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical

manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

130. Ms. Alphonse prays that the Court find BerlinRosen liable for discrimination in violation of 42 U.S.C. § 2000e-2, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## FOURTH CAUSE OF ACTION
### Violation of Title VII
### 42 U.S.C. § 2000e-2
### Retaliation

131. Ms. Alphonse repeats and realleges the allegations in this Complaint as if fully set forth herein.

132. At all times relevant, Ms. Alphonse was an employee and BerlinRosen was an employer within the meaning of Title VII.

133. Ms. Alphonse engaged in activity protected by Title VII, including but not necessarily limited to reporting race, color, and/or gender discrimination and retaliation to BerlinRosen leadership.

134. BerlinRosen took adverse action against Ms. Alphonse, including, *inter alia*, terminating her employment following her protected complaints.

135. BerlinRosen's adverse actions toward Ms. Alphonse were motivated by her protected activity, either in whole or in part.

136. As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Alphonse has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

20

137.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Alphonse's rights, justifying punitive damages.

138.    Ms. Alphonse respectfully prays that this Court adjudge BerlinRosen liable for retaliation in violation of Title VII and grant all relief allowed under the law, as set forth in the Prayer in this Complaint.

### FIFTH CAUSE OF ACTION
### Violation of the New York State Human Rights Law
### N.Y. Exec. Law 290 et seq.
### Discrimination

139.    Ms. Alphonse incorporates each and every allegation of this Complaint as if fully set forth herein.

140.    At all times relevant, Ms. Alphonse was an employee and BerlinRosen was an employer within the meaning of the NYSHRL.

141.    BerlinRosen subjected Ms. Alphonse to differential terms and conditions of employment, harassed her, subjected her to a hostile environment, and terminated her.

142.    BerlinRosen's adverse and/or differential treatment of Ms. Alphonse was motivated by her race, color, and/or gender, either in whole or in part.

143.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Alphonse has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

144.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Alphonse's rights, justifying punitive damages.

21

145.    Ms. Alphonse prays that the Court find BerlinRosen liable for discrimination in violation of the NYSHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**SIXTH CAUSE OF ACTION**
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law 290 et seq.**
**Retaliation**

146.    Ms. Alphonse repeats and realleges each and every allegation of this Complaint as if set forth herein.

147.    At all times relevant, Ms. Alphonse was an employee and BerlinRosen was an employer within the meaning of the NYSHRL.

148.

149.    Ms. Alphonse engaged in activity protected by the NYSHRL, including but not necessarily limited to reporting race discrimination and retaliation to BerlinRosen leadership.

150.    BerlinRosen took adverse action against Ms. Alphonse, including, *inter alia*, terminating her employment following her protected complaints.

151.    BerlinRosen's adverse actions toward Ms. Alphonse were motivated by her protected activity, including her complaint of discrimination, either in whole or in part.

152.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Alphonse has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

153.    BerlinRosen's actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Alphonse's rights, justifying punitive damages.

154.    Ms. Alphonse prays that this Court find BerlinRosen liable for retaliation in violation of the NYSHRL, and grant all relief permitted by law, as set forth in the Prayer to this Complaint.

**SEVENTH CAUSE OF ACTION**
**Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code 8-101 et seq.**
**Discrimination**

155.    Ms. Alphonse incorporates each and every allegation of this Complaint as if fully set forth herein.

156.    At all times relevant, Ms. Alphonse was an employee and BerlinRosen was an employer within the meaning of the NYCHRL.

157.    BerlinRosen treated Ms. Alphonse less well than other employees outside of her protected status(es).

158.    BerlinRosen's adverse and/or differential treatment of Ms. Alphonse was motivated by her race, color, and/or gender, either in whole or in part.

159.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Alphonse has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

160.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Alphonse's rights, justifying punitive damages.

161.    Ms. Alphonse prays that the Court find BerlinRosen liable for discrimination in violation of the NYCHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

23

**EIGHTH CAUSE OF ACTION**
**Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code 8-101 et seq.**
**Retaliation**

162.    Ms. Alphonse repeats and realleges each and every allegation of this Complaint as if set forth herein.

163.    At all times relevant, Ms. Alphonse was an employee and BerlinRosen was an employer within the meaning of the NYCHRL.

164.    Ms. Alphonse engaged in activity protected by the NYCHRL, including but not necessarily limited to reporting race and gender discrimination and retaliation to BerlinRosen leadership.

165.    BerlinRosen took adverse action against Ms. Alphonse, including, *inter alia*, terminating her employment following her protected complaints.

166.    BerlinRosen's adverse actions toward Ms. Alphonse were motivated by her protected activity, either in whole or in part.

167.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Alphonse has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

168.    BerlinRosen's actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Alphonse's rights, justifying punitive damages.

169.    Ms. Alphonse prays that this Court find BerlinRosen liable for retaliation in violation of the NYCHRL, and grant all relief permitted by law, as set forth in the Prayer to this Complaint.

## JURY DEMAND

170.    Ms. Alphonse respectfully demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Ms. Alphonse respectfully requests that this Court grant judgment for her and order the following relief against Defendant:

(1)    A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Ms. Alphonse's rights as secured by Section 1981; Title VII; the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.;

(2)    Reinstatement to the highest position to which Ms. Alphonse was and would be entitled and/or front pay;

(3)    Back pay with interest based on Ms. Alphonse's appropriate compensation had she not been wrongfully terminated;

(4)    Reimbursement for social security, experience, training opportunities, and other benefits, in an amount to be proved at trial;

(5)    Damages for future economic loss;

(6)    Compensatory damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial;

(7)    Liquidated damages and penalties;

(8)    Punitive damages;

(9)    Statutory attorneys' fees, expert fees, costs, and disbursements;

(10)    Interest; and

(11)    Such other and/or further relief as the Court deems just and proper.

25

Dated: July 28, 2026
New York, NY

Respectfully submitted,

KEENAN & BHATIA, LLC

_Hilary J Orzick_

_____

Hilary J. Orzick
Edward (E.E.) Keenan
233 Broadway, Suite 1810
New York, NY 10279
Tel: (212) 516-2273
hilary@keenanfirm.com
ee@keenanfirm.com
*Attorneys for Plaintiff Maxlorie Alphonse*

26